IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

WILLIAM E. SMITH                                                                                      PLAINTIFF

v.                            Civil No. 3:24-cv-03034-CDC

SHERIFF JOHN MONTGOMERY, Baxter
County, Arkansas; and DEPUTY JORDAN
IKARI                                                               DEFENDANTS

**OPINION AND ORDER**

      This is a civil rights action filed by Plaintiff William E. Smith pursuant to 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis*. Currently before the Court is the Motion for Summary Judgment (ECF No. 78) filed by Defendants John Montgomery and Jordan Ikari. The Court has also reviewed their Brief in Support (ECF No. 79) and Statement of Indisputable Material Facts (ECF No. 80), as well as Plaintiff's Response in Opposition (ECF No. 88). For the reasons given below, Defendants' Motion will be **GRANTED**.

**I. BACKGROUND**

      Plaintiff filed this lawsuit on July 29, 2024. His operative complaint alleges that on July 13, 2024, Defendant Deputy Jordan Ikari used excessive force when arresting him, breaking his face and nose. *See* ECF No. 21, pp. 4–5. Plaintiff further claims that after he was taken to the Baxter County Detention Center ("BCDC"), he was subjected to unconstitutional conditions of confinement and deprived of appropriate medical care for his injuries. *See id.* at 6–7. Additionally, Plaintiff claims that while he was at the BCDC, his access to legal mail, legal research, and to the courts was interfered with. *See id.* at 7. Finally, Plaintiff also claims that when he was arrested, two individuals at the residence where he was arrested stole his social security disability and EBT cards, and that subsequently no investigation or prosecution of this theft was undertaken. *See id.*

1

at 9–10.  Plaintiff brought this lawsuit against Defendant Ikari, as well as Defendants Baxter County Sheriff John Montgomery and BCDC Jail Administrator Tabitha Maze, each in their individual capacities only.  *See id.* at 4–9.  However, in March 2025, Plaintiff voluntarily dismissed his claims against Defendant Maze.  *See* ECF Nos. 61–64.

On June 13, 2025, Defendants Montgomery and Ikari moved for summary judgment on all of Plaintiff's claims against them.  *See* ECF Nos. 78–80.  The Court entered an Order directing Plaintiff to file his response by July 7, 2025.  *See* ECF No. 81.  On July 1, Plaintiff moved for an extension of this deadline, which the Court granted, extending it to July 22, 2025.  *See* ECF Nos. 86–87.  Plaintiff filed a Response (ECF No. 88) on July 15 which was defective in that it did not include any response to Defendants' Statement of Indisputable Material Facts (ECF No. 80), which Plaintiff had previously been specifically instructed to include with his response, *see* ECF No. 81.  However, on July 28, 2025, Plaintiff filed an (untimely) motion for another extension of his response deadline indicating that he had been released from custody and wished to supplement his response with new evidence.  *See* ECF No. 89.  The Court granted this request, giving Plaintiff a deadline by which to do so of August 15, 2025, *see* ECF No. 90, which was subsequently extended to September 26, 2025, *see* ECF No. 92.  Notwithstanding these repeated extensions of his deadline to supplement his summary judgment response, Plaintiff never provided any such supplementation; indeed, he has not filed anything at all in this matter since his July 28 motion.  Defendants' Motion for Summary Judgment is now ripe for decision.

## II.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

2

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  ANALYSIS

As noted above in Section I of this Opinion and Order, Plaintiff failed to respond to Defendants' Statement of Indisputable Material Facts (ECF No. 80). Accordingly, the material facts alleged therein are deemed admitted for purposes of this Motion. *See* Local Rule 56.1(b)–(c); Fed. R. Civ. P. 56(e)(2). As a practical matter this is fatal to Plaintiff's claims, but some discussion of why, accompanied by legal analysis, is necessary.

First, with respect to Plaintiff's claim for excessive force by Defendant Ikari during his arrest, Defendants have placed into the record uncontroverted evidence of the following facts. On July 13, 2024, Defendant Ikari was dispatched to the general store in Big Flat, Arkansas, where he spoke with Dustin Honeycutt. *See* ECF No. 80-2, p. 37. Honeycutt told Ikari that Plaintiff was drunk at Honeycutt's stepfather's house, had been threatening to shoot everyone there, had pointed

3

a handgun at Honeycutt's temple, and had then fired two shots into the grass near Honeycutt. *See id.* Ikari then went to the residence with a state trooper and Searcy County deputies. *Id.* Ikari went to the front door, identified himself, and ordered Plaintiff to come out with his hands up. *Id.* When Plaintiff opened the door to the residence, Ikari saw a gun in Plaintiff's left hand, which Plaintiff was attempting to hide by holding it out away from his body and behind the door. *See id.* Ikari ordered Plaintiff to drop the gun and put his hands up, but Plaintiff did not comply, and instead closed the door. *See id.* When Plaintiff reopened the door, the gun was no longer visible, but Plaintiff refused to comply with repeated orders from Ikari to lay down on the ground, stating that he was not going to do that. *See id.* Ikari then physically forced Plaintiff to the ground. *See id.* The collision of Plaintiff's face with the ground fractured his nasal bones. *See* 80-9, p. 6. Plaintiff was then taken to Baptist Regional Medical Center, where he was treated for his injuries. *See id.* at 4–9. Early the following morning, Plaintiff was transported from there to the BCDC. *See* ECF No. 80-2, pp. 47–49.

When an excessive force claim arises in the context of an arrest, it invokes the protections of the Fourth Amendment to the United States Constitution, which prohibits "unreasonable" seizures. *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989). The United States Supreme Court has instructed that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The test is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. When considering whether an officer's use of force in making an arrest was objectively reasonable, the Court should give careful attention to "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety

of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Here, the undisputed facts show that at the time of his arrest, Ikari had good reason to believe that Plaintiff had committed and was still in the process of committing violent crimes, that Plaintiff posed an immediate threat to Ikari's safety as well as to the safety of the other residents at the premises, and that Plaintiff was actively resisting arrest by concealing his gun and refusing to lay down on the ground as commanded. Accordingly, it was objectively reasonable for Ikari to use force to subdue Plaintiff and force him to the ground. Thus no constitutional violation occurred at the time of Plaintiff's arrest, and the Defendants are entitled to summary judgment on his claim for excessive force.

As for Plaintiff's remaining claims—that he was subjected to unconstitutional conditions of confinement and deprived of appropriate medical care for his injuries at BCDC; that his access to legal mail, legal research, and to the courts was interfered with at BCDC; and that two other individuals were allowed to steal his social security disability and EBT cards—there is no evidence in the record that Ikari or Montgomery had any involvement in these incidents at all. "Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990). A defendant in a § 1983 suit is entitled to summary judgment when the record contains no evidence that he had any personal connection with the conditions of which the plaintiff complains. *See id.*

Plaintiff's operative complaint never alleges that Defendant Ikari had any knowledge of any of the incidents surrounding these three remaining claims, nor even any ability to have participated in them. These claims do not appear to be brought against Defendant Ikari. As for Defendant Montgomery, Plaintiff's operative complaint also never alleges any knowledge or

5

involvement on his part with respect to Plaintiff's access to the courts or the theft of Plaintiff's cards; likewise, those two claims do not appear to be brought against Defendant Montgomery.[1]

With respect to Plaintiff's claim regarding the conditions of his confinement and medical treatment, his operative complaint alleges only in vague and conclusory fashion that these conditions were "at all times known by . . . Montgomery, having a deliberate indifference to the safety and welfare of his inmates." *See* ECF No. 21, p. 6. The specifics of Plaintiff's conditions-of-confinement allegations are that when he was booked into BCDC, after an overnight stay at the hospital, he was "placed in a box car origin cell with no mattress on the concrete floor, one blanket, no pillow," and remained in these conditions despite multiple grievances until "medical officials int[er]vened and advised . . . that Plaintiff should be given a mattress," at which time he was given one. *See id.* at 6–7. Plaintiff also alleges that at the time he was booked into BCDC there was no nurse on duty. *See id.* at 9.

Defendants have submitted uncontroverted evidence that BCDC policy is for all inmates to be issued a ¼-inch foam sleeping pad upon booking unless medical officials recommend that the inmate receive a thicker "medical" mattress, and that Plaintiff was initially issued the standard foam sleeping pad when he was booked. *See* ECF No. 80-1, ¶¶ 6–7; ECF No. 80-2, p. 48. Plaintiff's grievance file from BCDC shows that he submitted only one grievance requesting a medical mattress, on July 20, 2024, and that he was told in response to "speak to the nurse." *See* ECF No. 80-3, p. 6. As already noted, Plaintiff's operative complaint concedes that he was given a medical mattress when medical officials advised that this be done, *see* ECF No. 21, p. 7, and Defendants have submitted evidence that Plaintiff kept his medical mattress until he voluntarily relinquished it on May 5, 2025 so that he could move to an upstairs pod, *see* ECF No. 80-1, ¶¶ 8–

---

[1] As noted in Section I *supra*, BCDC Jail Administrator Tabitha Maze was also a Defendant in this case, but Plaintiff voluntarily dismissed his claims against her in March 2025. *See* ECF Nos. 61–64.

9; ECF No. 80-8. Defendants have also provided Plaintiff's medical file, showing that he was provided medications daily, *see generally* ECF No. 80-4, and that he received treatment at the hospital not only on the night he was arrested, but also a week and a half later, *see* ECF No. 80-1, p. 55; ECF No. 80-1, ¶ 10. By contrast, Plaintiff has not introduced any evidence showing that his medical needs were ignored. Most importantly, Plaintiff has not introduced any evidence showing that Defendant Montgomery had any knowledge of, or played any role in, Plaintiff's situation other than having approved a general policy that inmates be given a medical mattress when medical staff advise that it be done—a policy which was apparently adhered to in Plaintiff's case. Put simply, even if Plaintiff could prove that the conditions of his confinement or the quality of his medical treatment deprived him of some federal right, he cannot prove that the deprivation was inflicted by Defendant Montgomery.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants John Montgomery's and Jordan Ikari's Motion for Summary Judgment (ECF No. 78) is **GRANTED**, and Plaintiff William E. Smith's claims against them are **DISMISSED WITH PREJUDICE**. Judgment will be entered contemporaneously with this Order.

**DATED** this **20th day of January 2026**.

/s/ *Christy Comstock*
HON. CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE